# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

South Carolina Property and Casualty Insurance
Guaranty Association, Appellant/Respondent,

v.

Roger Brock, Ryan Stevens, Malachi Sanders and Health
Advantage/BCBS of Arkansas, Defendants,

Of whom Roger Brock is the Respondent/Appellant.

Appellate Case No. 2013-000402

―――――――――

Appeal from Charleston County,
R. Markley Dennis, Jr., Circuit Court Judge

―――――――――

Opinion No. 27458
Heard April 2, 2014 – Filed October 29, 2014

―――――――――

## AFFIRMED IN PART, REVERSED IN PART

―――――――――

Howard A. VanDine, III, A. Mattison Bogan, Erik T.
Norton and Tara C. Sullivan, all of Nelson Mullins Riley
& Scarborough, LLP, of Columbia, for Appellant/
Respondent.

Andrew D. Gowdown and Timothy J.W. Muller, of
Rosen, Rosen & Hagood, LLC, of Charleston, for
Respondent/Appellant.

―――――――――

**JUSTICE PLEICONES:** This appeal concerns the construction and application of the South Carolina Property and Casualty Insurance Guaranty Association Act (the Act), S.C. Code Ann. §§ 38-31-10 to -170 (2002 and Supp. 2013), and specifically the exhaustion/non-duplication provision in section 38-31-100(1). Roger Brock (Brock) was a passenger in a car involved in a wreck and sustained severe injuries. Brock settled his claim, but before payment was made, the insurance carrier responsible for the claim was declared insolvent and the claim was assumed by the South Carolina Property and Casualty Insurance Guaranty Association (Guaranty). Guaranty and Brock moved for summary judgment on the issue whether Guaranty may offset payments from solvent insurance carriers against Brock's settlement under section 38-31-100. The circuit court found section 38-31-100 was ambiguous and granted partial summary judgment to both parties, holding that Guaranty may offset some but not all of the benefits received by Brock from solvent insurance carriers. We disagree that section 38-31-100 is ambiguous and hold that the unambiguous language of section 38-31-100 provides that Guaranty may offset all payments from all solvent insurers made to Brock as a result of this wreck.

## FACTS

Brock was passenger in a vehicle driven by Brian Mason (Mason), which was involved in an accident with a logging truck, driven by Ryan Stevens (Stevens). [1] At the time of the accident, Stevens was insured through the owner of the logging truck, Malachi Sanders's (Sanders), policy issued by Aequicap Insurance Company (Aequicap).

Brock sustained severe injuries as a result of the wreck and filed suit. Soon after the litigation began, Brock settled his claim against Stevens and Sanders with Aequicap for $185,000 for the release of all claims.

Shortly after the settlement was reached but before Brock received any payment, Aequicap was declared insolvent. Because Aequicap was an insurer licensed to do business in the State of South Carolina and the insured was a resident of South Carolina, the claim was referred to Guaranty. As a result, Brock made demand on Guaranty for payment of the full settlement amount of $185,000. [2]

---

[1] Mason and Stevens were found to be jointly responsible for the wreck.

[2] *See* §§ 38-31-10 to 38-31-60.

As a result of the wreck, Brock received the following amounts directly from or paid on his behalf by solvent insurers:

a. Liability Coverage from Nationwide Ins. Co.
   (Mason's Policy)                                    $22,500.00

b. Payments for the provision of medical care by Health Advantage/BCBS of Arkansas
   (Brock's private pay medical insurance carrier)     $40,590.45

c. Uninsured Motorist coverage from Progressive Ins. Co.
   (resident relative coverage through Brock's parents' carrier)    $25,000.00[3]

d. Personal Injury Protection from Progressive Ins. Co.
   (resident relative coverage through Brock's parents' carrier)    $5,000.00

                                                    Total: $93,090.45

In the trial court, Guaranty asserted entitlement to offset all payments from the solvent insurers pursuant to section 38-31-100(1). As a result, Guaranty paid Brock $91,909.55, the difference between the settlement amount ($185,000) and the offset amount ($93,090.45). Brock alleged that he was entitled to the remaining $93,090.45, arguing that this would not lead to duplicative recovery. The circuit court found that section 38-31-100(1) was ambiguous, and held that Guaranty could not offset the benefits received under Mason's policy or the amount paid by Brock's medical insurance. The court did allow offset of the uninsured motorist (UM), and personal injury protection (PIP) benefits. As a result, the court ordered Guaranty to pay Brock an additional $63,090.45.

## STANDARD OF REVIEW

The parties agree that the issue is solely one of statutory interpretation. "Questions of statutory interpretation are questions of law, which we are free to decide without any deference to the court below." *CFRE, LLC v. Greenville Cnty. Assessor,* 395 S.C. 67, 74, 716 S.E.2d 877, 881 (2011).

---

[3] This uninsured motorist coverage was triggered by Aequicap's insolvency which rendered Stevens an uninsured motorist.

# DISCUSSION

This case is one of first impression and concerns the construction and application of the Act's exhaustion provision, section 38-31-100(1).

Guaranty is an unincorporated, non-profit legal entity. Because Guaranty is a creature of statute, its duties, liabilities, and obligations are controlled by the terms and conditions set forth in the Act. § 38-31-60. Pursuant to the Act, Guaranty must pay certain "covered claims," as the term is defined in section 38-31-20(8). [4] As a condition precedent to recovery from Guaranty, a claimant is required to first exhaust all available coverage from solvent insurers, and Guaranty is allowed to offset the full limits of such other coverage against its obligations under the Act. § 38-31-100.

Both parties agree that the $185,000 settlement entered into by Aequicap qualifies as a "covered claim" for which Guaranty is responsible under section 38-31-20(8). The parties disagree on what types of insurance coverage Guaranty may offset against its obligation to pay the $185,000. The exhaustion provision provides in relevant part:

> A person, having a claim under an insurance policy, whether or not it is a policy issued by a member insurer, and the claim under such other policy *arises from the same facts, injury, or loss that gave rise to the covered claim against the association*, is required to first exhaust all coverage and limits provided by any such policy. Any amount payable on a covered claim under this chapter must be reduced by the full limits of such other coverage as set forth on the declarations page and the association shall receive a full credit for such limits, or, where there are no applicable limits, the claim must be reduced by the total recovery. Notwithstanding the foregoing, no person may be required to exhaust all coverage and limits under the policy of an insolvent insurer.

§ 38-31-100(1) (emphasis supplied).

---

[4] A "covered claim" is "an unpaid claim . . . which arises out of and is within the coverage and is subject to the applicable limits of an insurance policy to which this chapter applies. . . ." § 38-31-20(8).

Brock contends the circuit court erred in permitting Guaranty to offset any of the insurance benefits. Conversely, Guaranty contends the circuit court erred by holding that Guaranty was not able to offset the proceeds of Mason's policy and the amount of medical insurance benefits provided to Brock. We agree with Guaranty that the Act unambiguously provides that Guaranty may offset all the proceeds received by Brock in this case.

"All rules of statutory construction are subservient to the one that legislative intent must prevail if it can be reasonably discovered in the language used, and that language must be construed in light of the intended purpose of the statute." *McClanahan v. Richland Cnty. Council,* 350 S.C. 433, 438, 567 S.E.2d 240, 242 (2002). "What a legislature says in the text of a statute is considered the best evidence of the legislative intent or will. Therefore, the courts are bound to give effect to the expressed intent of the legislature." *Id.* Thus, we must follow the plain and unambiguous language in a statute and have "no right to impose another meaning." *Id.*

Applying section 38-31-100(1), Brock received payments under the medical, UM, and PIP insurance coverages, as well as from Mason's policy. These claims were paid "under an insurance policy," and the claims arise from "the same facts, injury or loss" that gave rise to the $185,000 settlement. Thus, this $185,000 covered claim should, under § 38-31-100(1), be offset by the full limits of these policies.

As we find section 38-31-100(1) unambiguous, the trial court erred in turning to other jurisdictions' applications of their own provisions.[5] We also disagree with Brock and the ruling below that allowing set-off in this case offends the "collateral source rule."

The trial court and Brock misconstrue the applicability of the collateral source rule. The collateral source rule provides that a tortfeasor has no right to any mitigation of damages because of payment or compensation received by the injured person from a source wholly independent of the wrongdoer. *Johnston v. Aiken Auto Parts,* 311 S.C. 285, 428 S.E.2d 737 (Ct. App. 1993). This scenario is not comparable to the traditional application of the collateral source rule, since Guaranty is neither the wrongdoer nor the insurer of a wrongdoer, but is instead a statutory entity that

---

[5]Moreover, the jurisdictions which have found their statutes to be ambiguous have statutes that contain different language than section 38-31-100(1). *Compare* Utah Code § 31A-28-213 (Supp. 2008) and 8 V.S.A § 3619(a) (2013) *with* § 38-31-100(1).

exists to provide some protection for the insureds of insolvent insurance companies. *See S.C. Prop & Cas. Ins. Guar. Ass'n v. Carolinas Roofing & Sheet Metal Contractor's Self-Insurers Fund*, 303 S.C. 368, 369, 401 S.E.2d 144, 145 (1991) ("The Guaranty Association's function is to provide protection for insureds in the event their insurance carriers become insolvent."). Therefore, we do not agree with the circuit court or Brock that allowing Guaranty to offset the payments from solvent insurers in this case would effectively permit a tortfeasor to benefit from the victim's decision to carry insurance and violate the collateral source rule. [6]

Finally, we note that on appeal, Guaranty argues it should be entitled to an offset of the policy limit of $25,000 from Mason's liability insurance policy rather than the $22,500 that Brock accepted. [7] This offset would be permitted under our reading of section 38-31-100(1), since it provides that "the covered claim under this chapter must be reduced by the full limits of such other coverage . . . and [Guaranty] will receive full credit for such limits." However, in the circuit court, Guaranty asserted it was seeking to offset only $22,500 in liability coverage and not the full policy limits. [8] Thus, the argument that Guaranty may offset the full $25,000 is not preserved since it was not raised below. *Nationwide Mut. Ins. Co. v. Hunt,* 327 S.C. 89, 488 S.E.2d 339 (1997). Therefore, Guaranty is entitled to set-off only $22,500 in liability coverage. Accordingly, we reverse the circuit court and hold that Guaranty is entitled to offset the full $93,090.45 paid by solvent insurers.

**AFFIRMED IN PART, REVERSED IN PART.**

**TOAL, C.J., BEATTY, KITTREDGE and HEARN, JJ., concur.**

---

[6] The circuit court held that allowing set-off of the medical insurance benefits would effectively penalize Brock for carrying medical insurance. To the contrary, Brock was not prohibited from using the cost of medical care he received as a component of his damages in arriving at the negotiated settlement. Thus, in establishing his damages, Brock was not penalized by his procurement of medical insurance, the danger sought to be guarded against by the collateral source rule.

[7] This is the only coverage for which Guaranty argues it is entitled to offset more than Brock actually received.

[8] If Guaranty were seeking offset of the full $25,000 limit of the policy below, it would have only paid Brock $89,409.45, which would have reflected the $25,000 offset plus the other benefits received under the medical, PIP, and UM coverage.